# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable A. Bruce Campbell

| | |
|---|---|
| In re: ) | |
| ) | |
| K & J PROPERTIES, INC. ) | Case No. 02-26975 ABC |
| Y & B PROPERTIES, LLC ) | Case No. 02-26976 ABC |
| INDIAN CREEK INVESTMENTS, LLC ) | Case No. 02-26977 ABC |
| ) | Chapter 11 |
| Debtors. ) | |
| ) | *(Jointly Administered Under* |
| ) | *Case No. 02-26975)* |
| ) | |
| DANIEL A. HEPNER, Chapter 11 Trustee, ) | |
| ) | |
| Plaintiff, ) | Adversary No. 04-1500 ABC |
| v. ) | |
| ) | |
| PWP GOLDEN EAGLE TREE, LLC, ) | |
| ) | |
| Defendant. ) | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND RULING

The primary issue presented in this adversary proceeding is whether an over-secured creditor, PWP Golden Eagle Tree, LLC ("PWP"), is entitled to collect from these bankruptcy estates post-petition default interest on its claim at a rate of 36% per annum. The Chapter 11 Trustee in these three cases, Daniel A. Hepner ("Trustee"), on application and order of this Court, paid the entire amount of principal, interest, and collection costs claimed by PWP, reserving the Trustee's rights to recover any overpayment. This the Trustee did in order to mitigate the bankruptcy estates' default interest exposure pending adjudication of PWP's claim.[1]

The Trustee also asserts claims against PWP challenging the reasonableness of its attorneys' fees and costs; seeking a civil contempt determination for PWP's failure to apply repayments in accordance with the Trustee's expectations; and seeking a determination that, under sections 1123(a)(5)(G) and 1124(2), repayment of PWP's principal cures the defaults on these loans and reverses the accrual of default interest after the petition date.

---

[1] The per diem accrual of interest at PWP's claimed 36% default rate was approximately $1634.00. The Trustee, within the constraints of section 345 of the Bankruptcy Code, was earning something less than $136.00 per day on the cash he had available on hand to repay PWP's principal.

The Court has jurisdiction of this matter under 28 U.S.C. §§ 1334(a) and (b) and 28 U.S.C. §§ 157(a) and (b)(1). This is a core proceeding pursuant to 28 U.S.C § 157(b)(2)(B), as it concerns the allowance or disallowance of claims against these bankruptcy estates. This matter was tried to the Court on February 22, 2005; March 23, 2005; and March 30, 2005. After taking evidence and hearing arguments, the Court took the matter under advisement.

## BACKGROUND

On October 21, 2002, K&J Properties, Inc. ("K&J"), Indian Creek Investments, LLC ("ICI"), and Y&B Properties, LLC ("Y&B") (collectively referred to as the "Debtors") each filed its Chapter 11 bankruptcy petition. These cases were administratively consolidated on October 31, 2002. Shortly after the trial of this matter, the Trustee successfully confirmed a joint liquidating plan for these Debtors.

The Debtors together owned and undertook to develop a ranchette project in Larimer County, Colorado. The project was known as the Indian Creek Ranch Development. The first phase of this development saw sales of approximately a dozen ranchette parcels. Homes were built on several of these parcels. Ten lots in this initial phase remained owned by the "developer" entity, K&J. At the time of the filing of these bankruptcy cases, there were serious disputes between purchasers of lots in this first phase and the Debtors. The Debtors had failed in performance of many undertakings to the property owners, including failure to provide infrastructure to the development as promised.

ICI and Y&B together owned approximately 1540 acres of the remaining land in the development. At the petition date in these cases, that acreage was under contract to Larimer County who was interested in acquiring it for open space. The contract was abandoned by the Debtors and the County, and another contract between the same parties, but on different terms, replaced it. On April 8, 2003, ICI and Y&B applied to the Court for authority to sell the 1540 acres to Larimer County. That application was approved by the Court on May 15, 2003, and the sale closed on May 30, 2003. The purchase price for the 1540 acres was $5,410,000, of which $3,500,000 was paid in cash at closing. The remaining $1,910,000 was paid with the County's nonrecourse carry-back note secured by part of the land which had been sold to the County. The $1,910,000 note was paid by the County when it matured in January of 2004.

While closing on the sale to Larimer County was pending, parties in interest sought to have a Chapter 11 trustee appointed to replace management of each of these Debtors. In early May 2003, the Court granted the application for appointment of a trustee for these Debtors, finding that the Debtors, under their own management, had failed in fulfilling their obligations to parties in interest in these cases. The Trustee became Chapter 11 trustee for each of these Debtors, effective upon the closing of the Larimer County land sale on May 30, 2003.

## THE LOANS

In August of 1999 and March of 2001, K&J borrowed from Guaranty Bank & Trust ("Guaranty") in the amounts of $1,500,000 and $1,100,000, respectively. The loans were secured by the land owned by K&J, Y&B, and ICI and were made for purposes of development of that land. The loans made by Guaranty were made in the regular course of its business, according to its normal procedures and loan underwriting standards. The loans were priced at normal rates for loans of this sort, with a pre-default, floating interest rate indexed at 1½ and 2 points over the *Wall Street Journal* prime rate. Each loan carried a fixed 36% default interest rate. The $1,500,000 loan matured on February 19, 2002. The $1,100,000 loan matured on March 6, 2002. Neither was paid on its maturity. After unsuccessfully trying to discuss with the Debtors these past due loans, Guaranty made demand for payment and, effective May 1, 2002, began accruing interest on each loan's outstanding principal at the 36% default rate.[2] The loans' pre-default rate, immediately before they began accruing default interest, was 6.25% on the first loan and 6.75% on the second loan. At the date of the Debtors' bankruptcies, the outstanding unpaid principal on the $1,500,000 loan was $534,098.33 and the unpaid principal balance on the $1,100,000 loan was $1,100,000.

Within weeks after making demand for payment of these loans, Guaranty both initiated non-judicial foreclosure proceedings against its collateral and initiated suit against the Debtors' principals who had guaranteed these loans. Within weeks of having undertaking collection efforts on these defaulted credits, Guaranty learned of PWP's interest in acquiring these loans. In August of 2002, PWP entered into a contract with Guaranty for the purchase of the two Indian Creek Development loans. That contract closed in September of 2002, with PWP taking an assignment, without recourse, of all of Guaranty's right, title and interest in these loans for a purchase price of $1,777,500.[3]

It is uncontested in this adversary proceeding that, absent bankruptcy, 36% is a legal and enforceable rate of interest under applicable state law. In fact, the Trustee paid this rate on this claim pre-petition without dispute, acknowledging that 36% is a legal rate of interest in Colorado for nonconsumer real estate development loans such as those in question.

---

[2]There was evidence that Guaranty initially booked the default rate on these loans internally at 18%. That rate of 18% was neither communicated to the borrowers nor authorized by any officer of Guaranty with authority to adjust interest rates. The 18% default rate that was initially booked was done so by a clerical error that was promptly changed to 36% when discovered.

[3]This amount was approximately $143,000 in excess of the outstanding principal balance of the loans, but was a discount of approximately $178,000 from total principal and interest accrued at September 17, 2002.

3

### DELAY IN PAYOFF OF PWP

The sale to Larimer County pursuant to this Court's Order and Bankruptcy Code section 363(b) and (f) generated cash to which PWP's lien attached in an amount well in excess of the loans to PWP. However, the Trustee did not then pay PWP, its claimed accrual of post-petition interest at 36% notwithstanding. From shortly after his appointment in the spring of 2003, through the summer of 2003, the Trustee first investigated and satisfied himself of the validity of PWP's lien position, and then negotiated concerning payoff of the loans. There was no credible evidence that these negotiations were conducted other than in good faith by both PWP and the Trustee. Thus, any delay in payoff over the summer of 2003 was by the Trustee's own choice, in the exercise of his own sound business judgment.

### PAYMENTS UNDER PROTEST BY THE TRUSTEE

In September 2003, the Trustee, having been unsuccessful in negotiating the payoff amount with PWP, applied to the Court to allow a payment to PWP thereby stopping interest from accruing, in the worst case, at 36%, pending adjudication or other resolution of the contested issues concerning PWP's default interest rate and collection costs. The Trustee's initial September 25, 2003 motion ("First Tender Motion") to permit tender of payment to PWP was met with no opposition from PWP. An order entered October 16, 2003 (the "First Tender Order") granting the Trustee's request "to effectuate the tender of partial payment [to PWP] in accordance with the terms set forth in the Motion."

The First Tender Motion set out that PWP claimed post-petition default interest at 36% per annum but that the Trustee believed that 12% post-petition default interest was a prudent rate which he was willing to pay. The Trustee requested authority to pay PWP default interest at the 12% rate, leaving in dispute at October 15, 2003, post-petition interest of $391,094.72, the difference between the 36% claimed by PWP and the 12% rate selected by the Trustee.

The Trustee's purpose in filing the First Tender Motion was to reduce accruing interest, pending settlement or adjudication of PWP's claim amount, while at the same time preserving the competing positions of PWP and the Trustee. In the Trustee's own words:

> The Trustee would simply put off, until another day, the payment of the balance of any unresolved, accrued post-petition default interest and attorneys' fees. ... This tender would be without prejudice to PWP or the Trustee to assert any and all claims or defenses which they believe necessary or prudent at the time that the amount of this claim is finally determined. ...

First Tender Motion at ¶ 24, p. 5. The Trustee believed that by making the payment authorized by the First Tender Order, he would at least repay all principal claimed by PWP, leaving only to resolve the question of whether PWP was entitled to more than 12% post-petition default interest and the collection costs it had demanded.

4

The promissory notes that underly PWP's claim provide that,

> All amounts received by Lender shall be applied first to late payment charges and expenses, then to accrued interest, and then to principal.

On October 20, 2003, the Trustee tendered and PWP accepted $2,211,854.82. PWP applied the payment made to it by the Trustee first to claimed accrued interest and then to principal, leaving unpaid principal which PWP claimed continued to accrue interest at the 36% default rate.

On February 3, 2004, the Trustee, having learned that PWP had not applied the October 2003 payment as he had expected, and that, accordingly, PWP claimed continuing 36% post-petition accruing default interest on remaining unpaid principal, filed a second application to pay PWP under protest (the "Second Tender Motion"). This time, the Trustee sought to pay all amounts PWP claimed were still outstanding for principal, accrued interest at the post-petition default rate of 36%, and for collection costs, again reserving both parties' rights to contest what was the allowable amount of PWP's claims for post-petition default interest and collection costs. On March 4, 2004, the Court granted the Trustee's Second Tender Motion and authorized payment of $511,222.91, plus $372.14 per day from January 16, 2004, to payment, again preserving the parties' rights in their dispute concerning the allowable amount of PWP's claimed post-petition interest and expenses.

## PWP's COLLECTION COSTS CLAIM

With his second tender under protest in March 2004, attorneys' fees and costs were paid to PWP by the Trustee in the amount of $96,834.36. Of these, the Trustee concedes the reasonableness of $47,995.29, but seeks return of $48,839.07. The attorneys' fees and costs objected to by the Trustee fall into three categories. The first is $16,892.32 incurred by the predecessor holder of these loans, Guaranty. The second category objected to by the Trustee is in the amount of $15,146.75 incurred by PWP in its failed attempt to stop the sale of land by the Debtors to Larimer County. The third category of fees of which the Trustee seeks return is in the amount of $16,800.00 incurred by PWP in its collection suit against guarantors of these two loans.

The Trustee objects to $16,892.32 of Guaranty's fees and costs because these were not incurred by PWP, and the note purchase agreement between PWP and Guaranty does not specify either that Guaranty was assigning its right to accrued collection costs under its notes or that PWP was paying for that right. Guaranty, however, sold and assigned all its rights under these loan documents, which included the right to be reimbursed for attorneys' fees and collection costs to the extent permitted by applicable law. These fees and costs had not been paid to Guaranty and were outstanding when PWP bought these loans. Under applicable Colorado law and section 506(b) of the Bankruptcy Code, these fees and costs are allowable to the extent they are reasonable. The testimony of officers of Guaranty and PWP's principal support the conclusion that these collection costs charged to Guaranty are reasonable.

5

The $15,146.75 of fees incurred by PWP in its failed effort to object to Larimer County's purchase of land from the Debtors and to purchase this land itself, is not allowable as part of PWP's collection costs. Reasonable or not, these simply were not collection costs. Mr. Padilla's suggestion in his testimony that he sought to abort the Larimer County sale in the interest of protecting PWP's collateral is as incredible as it is illogical. The Larimer County sale converted PWP's collateral to cash sufficient to pay PWP fully.[4] In the course of the trial of this matter, PWP acknowledged it was not entitled to this $15,146.75.[5]

The Trustee argues that the $16,800.00 spent by PWP on the suit that was filed in the late spring of 2002 against the guarantors of these loans does not represent reasonable collection costs. The Trustee, with the benefit of hindsight, testified that such a "scorched earth" collection approach that pursued both guarantee litigation and nonjudicial foreclosure of the real estate collateral was not reasonable where the collateral ultimately sold for more than three times the amount of the subject debts. Guaranty's collection effort, which was continued by PWP, was not unreasonable. At the time suit on the guarantees and foreclosure was initiated, the loans were well past due, the borrowers were refusing to meet to discuss a workout on these credits, the borrowers' principals were feuding, people who had bought building lots were in serious disputes involving the developers' failure to perform, parts of the development were the subject of serious, complex disputes with the Environmental Protection Agency, and one significant mechanic's lien had been filed. Under these circumstances, an aggressive collection effort was not unreasonable. In the fall of 2002, PWP simply continued what Guaranty started in the summer of 2002. In hindsight, after the Larimer County sale, it is apparent that suit against the guarantors was an unnecessary expense. But the reasonableness of Guaranty's and PWP's collection strategy should not be judged in hindsight.

## EVIDENCE CONCERNING 36% INTEREST RATE

The Trustee and PWP presented extensive and conflicting evidence concerning Guaranty's 36% default interest rate: whether it is customary or extraordinary, equitable or unequitable, compensatory or penal, reasonable or arbitrary. There was but one aspect of the 36% interest rate where there was no conflict in the parties' positions or evidence. The Trustee has conceded that 36% is a legal rate of interest for commercial loans under Colorado law and has paid without protest the 36% default rate through the petition date in these bankruptcy cases.

The Trustee asks the Court to apply "equitable considerations" to the 36% default rate after the petition date in these cases. In the Trustee's considerable experience, 36% is unusually high for a default rate in the Colorado business lending community. Furthermore, the spread of almost 30

---

[4]Contrary to the Trustee's contention, PWP's attempt to derail the Debtors' sale to Larimer County, however motivated, did not, in fact, delay the period over which the PWP loans remained unpaid with interest accruing.

[5]PWP announced in open court it would tender this $15,146.75 amount back to the Trustee. The Trustee apparently declined that tender, preferring to resolve all of the amounts in dispute with PWP by this Court's ruling.

points, and a 600% increase is an extraordinarily large difference between pre and post-default rates. The Trustee contends that a 36% rate would be a penalty, as the evidence demonstrates little relation between this rate and actual costs associated with these defaulted loans. Finally, insiders' claims in these cases have been voluntarily subordinated to third-party claims through the plan of reorganization. The Trustee maintains that it is not equitable to further subordinate these claims by enforcing an arbitrary default rate of 36%.

PWP, in turn, argues that, in the circumstances of this case, a 36% default rate is not inequitable at all. That rate reflects what is for Guaranty completely standard loan underwriting procedure, supported by valid business purposes.[6] PWP, on purchasing these credits from Guaranty, chose to make a high-risk investment. Where, as here, the investment turned out to be sound, PWP maintains that it is unfair to deprive it of a concomitant high rate of return. Even if these Debtors are not solvent, each dollar by which PWP's default rate is reduced will redound directly to the benefit of these Debtors' insider owners. The evidence shows it was they who made a mess of the subject development. It was they who mismanaged these Debtors in bankruptcy, requiring the appointment of a trustee. It was they who, in the first instance, agreed to a 36% default interest rate. Finally, PWP maintains that there is no evidence of improper conduct on its part with respect to these loans.

The Trustee and PWP each supported its position concerning enforcement of the 36% default interest rate with the opinions of an expert. The Trustee's expert is very experienced in working with problem credits, both from the perspective of commercial borrowers and institutional lenders. In his opinion, a 36% default rate is arbitrary, excessive and punitive. This is so because it would far exceed the cost to the lender of having its loan go into default, and it far exceeds the typical increase of one to six percentage points over the pre-default rate. This expert testified that he had never seen a default rate as high as 36% and that any fixed default rate is, in his experience, a rare phenomenon.

PWP countered with an expert who, from years of experience as a bank examiner for the Office of the Comptroller of the Currency and now as a private consultant on troubled commercial loans, was very familiar with banking practice and procedure. It was this expert's opinion that there was nothing either unusual or the least bit improper about a 36% default interest rate. This opinion was based on review of literally thousands of commercial bank loans where default rates of 20% to 36% were not uncommon, and where either fixed or variable default rates were common, "up to the legal limit." In the opinion of this expert, relatively high default rates were a common means of seeking to cover the indirect costs of pooled nonperforming assets within a lending institution.

---

[6]Officers of the bank testified that charging relatively high default rates of interest provides an incentive for borrowers not to default. When collected, default interest helps cover increased overhead costs associated with any non-performing loans. High default interest rates sometimes make troubled loans more attractive to speculating investors, thereby helping the bank dispose of non-performing assets.

Looking for justification of a default rate by its direct relation to actual costs of a defaulted loan to a lender is complicated by the evidence that default interest is rarely collected when a loan goes into default.

## ALLOWANCE OR DISALLOWANCE OF POST-PETITION DEFAULT INTEREST

While there are at least three distinct rules that have been applied by the courts in dealing with post-bankruptcy petition default interest rates of over-secured creditors,[7] the analysis begins with the section of the Bankruptcy Code which addresses allowance of secured claims. Section 506(b) states in relevant part as follows:

> To the extent that an allowed secured claim is secured by property the value of which... is greater than the amount of such claim, there shall be allowed... interest on such claim, and any reasonable fees, costs or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b).

The statute, without qualification, dictates that interest "shall be allowed" on over-secured claims. One line of authority holds that the only limitation on the over-secured creditor's right to collect post-petition interest, at pre or post-petition default rates, is enforceability of the right to collect such interest under non-bankruptcy law – ordinarily applicable state law. Unlike interest, the statute mandates a further qualification for the enforceability of the over-secured creditor's "fees, costs, or charges." Those must not only be provided for under the agreement under which the claim arose, but they must also be "reasonable."

A second line of authority imposes the fees-costs-and-charges "reasonableness" mandate from section 506(b) on interest as well, but only on default interest. These decisions reason that default interest is not really interest at all for section 506(b) purposes, but instead is a "charge" which is subject to the statutory reasonableness limitation of section 506(b). See *In re AE Hotel Venture*, 2005 WL 361534 (Bankr. N.D. Illinois 2005); *In re Kalian*, 178 B.R. 308 (Bankr. D.R.I. 1995).

The rationale of the *AE Hotel Venture* case is unpersuasive. The court maintains that pre-default interest compensates for the time value of money, but post-default interest does not; it represents some other "charge," and thus, must be reasonable under section 506(b). This is a distinction without a difference. Pre and post-default interest rates are simply matters of pricing. The money costs more if not repaid when agreed. Had Congress wished to distinguish between the treatment of pre and post-default interest by section 506(b), it could easily enough have said so. As noted in *Averch, "The Right of Oversecured Creditors...", supra,:*

> A standard rule of statutory construction is that where Congress has demonstrated the ability to draft language to achieve a particular result, and then fails to employ that same language in a similar situation, it can be presumed that the failure was

---

[7]An excellent analysis of section 506(b) and post-petition interest claims is found in Averch, C., Collins, M. and Youngman, S., "The Right of Oversecured Creditors to Default Rates of Interest from a Debtor in Bankruptcy," 47 *The Business Lawyer* 961 (May 1992) (hereinafter cited as *Averch, "The Right of Oversecured Creditors..."*).

8

> deliberate. In section 506(b) of the Code, Congress expressly provided that attorneys' fees, costs and other charges must be "reasonable" in order to provide a federal standard of review for such amounts. By omitting any reasonableness standard for awards of interest, however, Congress arguably made clear its intent that interest should be awarded in accordance with the rate ceilings set by applicable non-bankruptcy law. (Citations omitted.)

*Id.* at pp. 968-69.

With respect to the cases treating default interest as a section 506(b) "charge," *Collier* notes,

> [S]ome courts have concluded that a default rate of interest may be denied as an unreasonable "charge," rather than as part of the creditor's allowable interest entitlement. (Footnote omitted.) In general, a default rate of interest is properly a form of interest. Recharacterization of the rate as a "charge" or a "penalty" should also turn in most instances on applicable, nonbankruptcy law.

4 *Collier on Bankruptcy*, ¶ 506.04[2][b], at pp. 506-112 (15th Ed.)

A third line of authority reasons that the Bankruptcy Court's equitable powers enable or require it to examine the circumstances of the over-secured creditor in each particular case and allow the Court's notions of fairness and equity to dictate the extent to which a default rate of interest is enforceable, if at all. Particularly important in this line of cases, among "equitable considerations" is whether the bankruptcy estate is solvent, thereby goring the ox of those who agreed to the default rate rather than that of unsecured creditors.[8] Other equitable considerations among these cases include whether the default rate of interest in issue is unusually high considered by itself or in comparison to the pre-default rate and whether there is a relationship between the default rate and the loss by the over-secured creditor that may be compensated, as opposed to a default rate that merely serves as a "penalty."

The Trustee urges the Court to employ a "flexible approach" to the PWP 36% rate, where strict application of state law would produce an inequitable result for other parties in interest in this case. In support of this proposition, the Trustee relies in part on the United States Supreme Court's ruling denying compound interest on equitable grounds in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156 (1946). The Eleventh Circuit, however, has aptly noted the flaw of reliance on *Vanston*. The Eleventh Circuit, in *In re Sublett*, 895 F.2d 1381 (11th Cir. 1990), observed that *Vanston* predates the Bankruptcy Code by thirty-two years and that "to the extent that *Vanston's* equitable analysis suggests a result contrary to the language of the Bankruptcy Code, *Vanston* has been superseded." *Id.* at p. 1386. Two years before the Eleventh Circuit decision in *Sublett*, the U.S. Supreme Court itself noted,

---

[8]Compare *In re Hollstrom*, 133 B.R. 535 (Bankr. Colo. 1991) (equitably adjusting an over-secured creditor's 36% default interest rate that would unduly disadvantage unsecured creditors of an insolvent bankruptcy estate) with *In re Wood Family Interests, Ltd.*, 135 B.R. 407 (Bankr. Colo. 1989) (same judge concludes default interest rate allowable where debtor is solvent.) See also *In re Consolidated Operating Partners L.P.*, 91 B.R. 113 (Bankr. Colo. 1988) (allows over-secured creditor's post-petition default interest in solvent bankruptcy estate, as failure to do so would be a windfall to the debtor.)

> Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.

*Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).

In *In re Lapiana*, 909 F.2d 221 (7th Cir. 1990), the Seventh Circuit, acknowledging that the Bankruptcy Court may consider equitable defenses to a claim for post-petition interest,[9] cautioned against liberal application of the Bankruptcy Court's equitable powers:

> It is true, of course, that bankruptcy, despite its equity pedigree, is a procedure for enforcing pre-bankruptcy entitlements under specified terms and conditions rather than a flight of redistributive fancy or a grant of free-wheeling discretion, such as the medieval chancellors enjoyed. . . .
>
> We deprecate flaccid invocations of "equity" in bankruptcy proceedings. Creditors have rights, among them the right of over-secured creditors to post-petition interest, and bankruptcy judges are not empowered to dissolve rights in the name of equity. Flexible interpretation designed to allow the judicial interpolation of traditional defenses in a statute silent on defenses is one thing; standardless decision-making in the name of equity is another.

909 F.2d at 223-24.

Being guided by a judge's sense of what is fair under the circumstances, as opposed to the language of the Bankruptcy Code and the dictates of non-bankruptcy law, may be a precariously slippery slope. If a bankruptcy court can decide, in particular circumstances, that an otherwise enforceable default interest rate is too high, what restrains it from also determining, without relying on Bankruptcy Code language or nonbankruptcy law, that the amount paid by a debtor on any credit sale of goods or services is inequitable in the circumstances, and thus unenforceable as a claim in bankruptcy? In a climate of skeptical co-equal branches of government and a citizenry that is poorly informed about the import of judicial independence, substituting the court's equitable powers for the marketplace, as it is constrained by legislative dictate, is not without risks to stability of the judiciary that may accompany failure to restrain judicial discretion. This nation's tradition of a "rule of law" embraces the notion of a populace that will accept the courts as ultimate arbiter in applying the law to resolve disputes. In order to maintain this tradition, courts must nurture the public's confidence that courts will not, in the name of judges' vision of justice or equity, substitute judges' will for that of the people, as expressed in the statutes enacted by the people's elected representatives.

Section 506(b) mandates that interest on over-secured claims is allowable, and this statute draws no distinction between pre and post-default interest. Except as otherwise provided in Title 11, nonbankruptcy law -- here Colorado law -- dictates the validity of claims. In a non-consumer credit transaction, a 36% rate of default interest is enforceable under Colorado law. See *Becker v.*

---

[9] If, under Colorado law, the Trustee were to have established that 36% interest was unenforceable in these circumstances as a "penalty" or otherwise, the result might be different in this case. The Court was presented no evidence or argument to this end.

*Marketing & Research Consultants, Inc.*, 526 F.Supp. 166, 169 (D. Colo. 1981). The Trustee has conceded this. In collecting cases on post-petition default rates of interest in favor of over-secured creditors, Collier notes:

> ... Most courts have allowed, or at least recognized a presumption of allowability for, default rates of interest, provided that the rate is not unenforceable under applicable non-bankruptcy law. (footnote omitted.) In general, just as there is no express mechanism in section 506(b) for adjusting basic interest rates, courts should be reluctant to infer a mechanism for disallowing default rates of interest under federal law. Rather, the allowability of the rate should turn instead on applicable non-bankruptcy law.

*4 Collier on Bankruptcy*, ¶ 506.04[2][b], at pp. 506-111-112 (15th Ed.)

Under these circumstances, it is not the Court's charge with respect to PWP's interest rates to determine what is reasonable or equitable. The Trustee has not established a basis for his claim against PWP to a refund of the interest he has heretofore paid under protest to PWP.

### PLAN PROVISIONS AS CURE NULLIFYING RIGHTS TO POST-PETITION DEFAULT INTEREST

The Trustee maintains that plan provisions authorized by sections 1123(a)(5)(G) and 1124(1) effectively nullify PWP's right to post-petition default interest. Section 1123(a)(5)(G) says that a plan of reorganization shall provide a means for its implementation, and one of the ways it may do so is providing for cure or waiver of defaults. Section 1124(1), in turn, says a class of claims under a plan need not be treated by the plan if claimants' rights are left unaltered. Subsection (2) of this statute says if a claim has been accelerated by default, and the default is cured by a plan, the original maturity may be reinstated and the claim treated as if unaltered, and not otherwise treated by the plan, so long as the plan does not otherwise alter the claimants' rights.

These provisions, on their face, are not applicable to the facts of this case for two reasons. First, the cure that was made in the defaults in PWP's loans was not made by these Debtors' plan of reorganization.[10] Furthermore, no reorganization plan of these Debtors could cure these loans and reinstate the original maturity, as the maturity date of these loans predated the filing of these Debtors' bankruptcies.

In any event, these statutory provisions concern de-acceleration and reinstatement of the original maturity date of a loan upon curing of a default. They say nothing about eliminating otherwise enforceable, accrued default interest which would have to be paid as part of the default cure. See *In re 139-141 Owners Corp.*, 313 B.R. 364, 368 (S.D.N.Y. 2004). But see *In re Entz-White Lumber and Supply Co., Inc.*, 850 F.2d 1338 (9th Cir. 1988). The 1994 amendments to

---

[10] In footnote 4 to the Trustee's brief, the Trustee alludes to an agreement between the Trustee and PWP "that all issues regarding [these statutes] would be resolved as part of this adversary proceeding."

11

section 1123 appear specifically to address this matter, requiring ". . . the amount necessary to cure the default, shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d). Section 1123(a)(5)(G) and section 1124(2) provide no basis to nullify the post-petition default interest claimed by PWP to the extent it is otherwise allowable under PWP's loan documents and applicable nonbankruptcy law.

## THE TRUSTEE'S CLAIM THAT PWP IS IN CONTEMPT OF THIS COURT'S OCTOBER 20, 2003 ORDER

In the fall of 2003, the Trustee had verified the validity of PWP's secured position, but had been unsuccessful in negotiating an agreement with PWP on the amount of its fees and the rate of post-petition default interest to which PWP was entitled. In order to reduce the estate's exposure on the 36% default interest rate PWP claimed was accruing, the Trustee sought court approval to pay PWP, but reserved his rights to recover any excess interest that was paid. As was set out in the Trustee's application to the Court, the Trustee sought authority to pay PWP all of its principal; pre-petition, pre-default rate interest to the date default was declared; pre-petition default rate interest from the date default was declared at the stated 36% rate; and post-petition, default rate interest at 12%. This 12% was the rate the Trustee selected as "reasonable." This, the Trustee stated in his motion, would pay all principal and leave for determination the spread for the post-petition period between 12% and 36%, but would stop the possibility of any further accruals at 36%, even if PWP ultimately prevailed.

On October 16, 2003, the Trustee obtained an order of this Court granting his application and authorizing him "to effectuate the tender of partial payment in accordance with the terms set forth in the Motion." When, on October 20, 2003, the Trustee paid $2,211,854.82 to PWP, he believed he paid all outstanding principal and all interest he believed he owed, leaving $391,094.77 unpaid interest in dispute, namely the difference between 36% and 12% on the principal of $1,634,098.33 from the petition date to the October 20, 2003 payment date.

When PWP received this October 20, 2003 payment, contrary to the Trustee's expectation, it did not apply it to all of the outstanding $1,634,098.33 principal balance on its loans. It applied it first to its outstanding interest, calculated at 36% for the post-petition interest, with the remainder applied to principal, leaving an outstanding aggregate principal balance of the two loans on PWP's books after the October 20, 2003 payment of $379,734.66, still accruing interest at 36%.

It is this failure by PWP to apply this payment "in accordance with the terms set forth in the Motion" that is the basis of the Trustee's claim that PWP should be found in contempt of this Court's October 20, 2003 Order. PWP counters that by the terms of the Trustee's own motion,

> . . . this tender would be without prejudice to PWP or the Trustee to assert any and all claims or defenses which they believe necessary or prudent at the time that the amount of this claim is finally determined. . . .

12

Trustee's September 26, 2003 Motion, ¶ 24. Furthermore, PWP points out that the promissory notes in issue prescribe that "all amounts received by Lender shall be applied first to late payment charges and expenses, then to accrued interest, and then to principal." Thus, maintains PWP, the Trustee's motion and Court's order were intended to preserve disputed claims, not resolve them. The Tenth Circuit has said that to be held in contempt a party must violate a "specific and definite court order." *In re Lucre Management Group, LLC*, 365 F.3d 874 (10th Cir. 2004). With respect to the application of funds that were paid by the Trustee to PWP, the Trustee's motion and this Court's order were, at best, ambiguous. PWP was not in contempt of that order in applying funds in accordance with its loan documents.

UPON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS

ORDERED that the Trustee is not entitled to recovery of any of the interest he has paid to PWP; and it is

FURTHER ORDERED that the Trustee is entitled to recover attorneys' fees and/or costs he has paid to PWP in the amount of $15,146.75; and it is

FURTHER ORDERED AND DECREED that the Trustee has failed to establish that PWP has acted in contempt of this Court's Order of October 20, 2003, authorizing payment by the Trustee to PWP; and it is

FURTHER ORDERED that PWP shall be awarded its costs herein on tendering a bill of costs to the Clerk of this Court within thirty (30) days of the date of this ruling.

DATED: 5-13-05

BY THE COURT:

_____
A. Bruce Campbell
United States Bankruptcy Judge